## Case No. 24-2026

# In The
# United States Court of Appeals
# For the Fourth Circuit

**CRYSTAL RICE,**

in her individual capacity and as Personal Representative
of the Estate of Cynthia Rice

*Plaintiff-Appellee*

**V.**

**SCOTT ADAMS; BARRY JANNEY; WILLIAM JOLLY; RICHARD RUNK; TYLER FOX; TIMOTHY DOW; JESSICA REIL; JACOB PLATT; MICHAEL REA; KATHLEEN KISNER; MATTHEW CARR; DARYL OSBORNE**

*Defendants-Appellants*

**and**

**PRIMECARE MEDICAL, INC.; M.L HALLIGAN; JEAN JONES; SAMANTHA CHESTNUT; TAYLOR KENNEDY-LAROSA; MARY ALLEN; KELLY KERLIN; TOBIAS MUTURI; ERICA JENKINS; BRIANNA CULP; PATRICIA MEARS; BENILIZ OHL; CHRISTOPHER KITCHER; DOE DEFENDANTS 1-50**

*Defendants*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

---

## BRIEF OF APPELLANTS

---

**Kevin Karpinski**
**John Karpinski**
**Karpinski, Cornbrooks, & Karp**
**120 E. Baltimore Street - Suite 1850**
**Baltimore, Maryland 21202-1617**
**410-727-5000**
Kevin@bkcklaw.com
Jkarpinski@bkcklaw.com
*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____      Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)


_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?      YES      NO
        If yes, identify all parent corporations, including all generations of parent corporations:


3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?      YES      NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    YES    NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      YES    NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                     YES    NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?            YES    NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____

Counsel for: _____

- 2 -

# Table of Contents

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF CASE ........................................................................ 2

STATEMENT OF FACTS ...................................................................... 5

SUMMARY OF THE ARGUMENT ....................................................... 9

ARGUMENT ........................................................................................ 10

   I.   STANDARD OF REVIEW .................................................. 10

   II.  THE DISTRICT COURT ERRED IN DENYING THE CORRECTIONAL OFFICER DEFENDANTS' MOTION ON THE BASIS OF QUALIFIED IMMUNITY .......................................... 11

     A. *The Qualified Immunity Analysis* ...................................... 11

     B. *The District Court Erred in Defining the Relevant Constitutional Right as Ms. Rice's Right to Medical Treatment for her Serious Medical Condition* ................................................................... 13

       *i. Defining the Right in Question* ....................................... 13

       *ii. The District Court's Error* ............................................. 14

       *iii. Correctional Officers Are Not Constitutionally Obligated to Override the Judgment of Medical Professionals* ........................... 19

     C. *The District Court Erred in Finding that Appellee Plausibly Pleaded that the Correctional Officer Defendants Violated Ms. Rice's Fourteenth Amendment to Medical Treatment* ............................... 24

     D. *The District Court Abused Its Discretion in Declining to Convert the Correctional Officers' Motion to a Motion for Summary Judgment* 30

CONCLUSION ..................................................................................... 33

REQUEST FOR ORAL ARGUMENT ..................................................... 35

## Table of Authorities

**Case**                                                                                           **Page**

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...................................................... 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................. 10, 27

*Atkinson v. Godfrey*, 100 F.4th 498 (4th Cir. 2024) ............................... 12, 13

*Barrett v. Bd. of Educ. of Johnston Cnty.*,
590 Fed.App'x 208 (4th Cir. 2014) .............................................................. 27

*Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) ......................................... 20

*Brubaker v. City of Richmond*, 943 F.2d 1363 (4th Cir. 1991) ..................... 28

*City of Tahlequah v. Bond*, 595 U.S. 9 (2021) ............................................... 11

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ..................................... 13

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) ...................... 13

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ....................................................................... 31

*Harrods Ltd. v. Sixty Internet Domain Names*,
302 F.3d 214 (4th Cir. 2002) ....................................................................... 31

*Erickson v. Pardus*, 551 U.S. 89 (2007) ....................................................... 10

*Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009) ................................... 10

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*,
721 F.3d 264 (4th Cir. 2013) ....................................................................... 31

*Halcomb v. Ravenell*, 992 F.3d 316 (4th Cir. 2021) ..................................... 12

*Hunter v. Bryant*, 502 U.S. 224 (1991) ......................................................... 12

*Iko v. Shreve* 535 F.3d 225 (4th Cir. 2008) ............................................. 22, 23

*Jackson v. Holley*, 666 Fed.App'x 242 (4th Cir. 2016) ................................. 10

*Jenkins v. Medford*, 119 F.3d 1156 (4th Cir. 1997) ........................................ 1

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) ..................................... 19, 20

*King v. Riley*, 76 F.4th 259 (4th Cir. 2023) ............................................ 13, 14

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) ...................................... 14, 25

*Langford v. Joyner*, 62 F.4th 122 (4th Cir. 2023) ............................ 25, 26, 28

*Marcilis v. Twp. of Redford*, 693 F.3d 589 (6th Cir. 2012) .......................... 26

*McGee v. Parsano*, 55 F.4th 563 (7th Cir. 2022) ................................... 19, 21

*McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998) .............................................. 12

*Milter v. Beorn*, 896 F.2d 848 (4th Cir. 1990) ....................................... 22, 23

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ..................................................... 1

*Nguyen v. CAN Corp.*, 44 F.3d 234 (4th Cir. 1995) ..................................... 31

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................ 11, 12

*Pfaller v. Amonette*, 55 F.4th 436 (4th Cir. 2022) ................................. 12, 15

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) .................................................. 13

*Robbins v. Oklahoma*, 519 f.3d 1242 (10th Cir. 2008) ............................... 25

*Scinto v. Stansberry*, 841 F.3d 219 (4th Cir. 2016) ......................... 13, 16, 17

*Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004) ....................................... 19, 23

*Stanton v. Sims*, 571 U.S. 3 (2013) ............................................................. 12

*Tarashuk v. Givens*, 53 F.4th 154 (4th Cir. 2022) ................................. 15, 17

iii

*Taylor v. Barkes*, 575 U.S. 822 (2015) ........................................................... 14

*Thompson v. Virginia*, 878 F.3d 89 (4th Cir. 2017) ................................. 12-13

*Thorpe v. Clark*, 37 F.4th 926 (4th Cir. 2022) .............................................. 10

*Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) .......................................... 26

**Statutes & Court Rules**                                                   **Page**

Fed.R.Civ.P. 8(a) ......................................................................................... 27

Fed.R.Civ.P. 56(d) ...................................................................................... 32

42 U.S.C. § 1983 .......................................................................................... 26

## **JURISDICTIONAL STATEMENT**

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff-Appellee Crystal Rice, individually and as personal representative of the Estate of Cynthia Rice ("Appellee"), asserted a 42 U.S.C. § 1983 claim for denial of medical care in violation of the Eighth and Fourteenth Amendments.

Defendants-Appellants Cecil County Sheriff Scott Adams and Cecil County Sheriff's Deputies Barry Janney, William Jolly, Richard Runk, Tyler Fox, Timothy Dow, Jessica Reil, Jacob Platt, Michael Rea, Kathleen Kisner, Matthew Carr, and Daryl Osborne ("the Correctional Officer Defendants") filed a Motion to Dismiss or, in the Alternative, for Summary Judgment based, among other things, upon qualified immunity with respect to the medical care that Ms. Rice received while incarcerated at the Cecil County Detention Center ("CCDC").[1] The District Court, construing the Correctional Officer Defendants' Motion as a Motion to Dismiss, denied qualified immunity. Pursuant to *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985) and *Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997), the Correctional Officer Defendants are entitled to challenge the District Court's denial

---

[1] Appellee has also named the following Cecil County Sheriff's Deputies in this action: M.L Halligan; Jean Jones; Samantha Chestnut; Taylor Kennedy-LaRosa; and Mary Allen. J.A. 2-5. These Deputies were, however, not served prior to the filling of the Correctional Officer Defendants' Motion.

1

of qualified immunity on an interlocutory basis.

The District Court issued a Memorandum Opinion and Order on September 27, 2024. The Correctional Officer Defendants timely noted an appeal on October 8, 2024.

## STATEMENT OF THE ISSUES

I.    Whether the District Court erred in denying the Correctional Officer Defendants' Motion on the basis of qualified immunity?

## STATEMENT OF THE CASE

Cynthia Rice was booked into the Cecil County Detention Center ("CCDC") at approximately 11:00 p.m. on August 28, 2020. J.A. 24, at ¶60. She informed intake staff that she had recently used opioids and would likely experience withdrawal. J.A. 24, at ¶59. She was seen by a qualified health care professional, employed by PrimeCare Medical, Inc. ("PrimeCare"), for a medical intake screening at 2:40 a.m. on August 29, 2020. J.A. 25, at ¶65. She was seen again by qualified health care professionals at 8:59 a.m. and 9:52 a.m. that same day. J.A. 15, at ¶14; J.A. 26, at ¶72. Between these visits, at approximately 9:43 a.m., a PrimeCare employee prescribed Ms. Rice an opioid detox regimen and clonidine. J.A. 25, at ¶70. She was also subsequently prescribed blood pressure medication. J.A. 26, at ¶72.

2

At approximately 12:30 p.m. on August 29, 2020, Ms. Rice informed a Sheriff's Deputy that she was not "ok." J.A. 16, at ¶16. When medical staff entered the cell, Ms. Rice was unresponsive. J.A. 16, at ¶16. She was pronounced deceased shortly thereafter. J.A. 16, at ¶16.

Ms. Rice's daughter, Plaintiff-Appellee Crystal Rice, filed suit individually and on behalf of her mother's estate on August 25, 2023. J.A. 5. Adopting a shotgun approach, Appellee named twenty-six (26) defendants, including Cecil County, PrimeCare, Cecil County Sheriff Scott Adams, sixteen (16) Cecil County Deputy Sheriffs, and seven (7) qualified health care professionals employed by PrimeCare. J.A. 17-24, at ¶¶ 23-57. She also named as Defendants Doe 1-50. J.A. 21, 24, at ¶¶40, 57. Appellee asserted the following claims:

> Count I—42 U.S.C. § 1983 Claim for Denial of Medical Care Against the Health Care Defendants, Custody Defendants, and Cecil County.
>
> Count II—*Monell* Claim for Denial of Medical Care Against Prime Care and Cecil County.
>
> Count III—Article 24 Maryland Declaration of Rights Claim Against All Defendants.
>
> Count IV—Negligence Claim Against the Custody Defendants and Cecil County.
>
> Count V—Intentional Infliction of Emotional Distress Claim Against All Defendants.
>
> Count VI—Wrongful Death Claim Against All Defendants.

3

Count VII—Respondeat Superior Claim Against Prime Care and Cecil County.

Count VIII—Indemnification Against Prime Care and Cecil County.

J.A. 26-39, at ¶¶79-162.

As it relates to Count I, Appellee attempted to plead that the Correctional Officer Defendants acted with deliberate indifference to Ms. Rice's serious medical needs when "they failed to diagnose her need for medical care, failed to provide her medical care, failed to accurately record the details of her condition, failed to respond to request for medical attention from Ms. Rice, and failed to provide Ms. Rice with emergency care or transfer to a facility where emergency care could be provided." J.A. 27, at ¶82. Alternatively, she pleaded that the Correctional Officer Defendants "were objectively unreasonable in their failure to provide medical attention to Ms. Rice." J.A. 27, at ¶83.

Cecil County, Sheriff Scott Adams, and the Correctional Officer Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment or, in the Alternative, to Bifurcate on December 27, 2023. J.A. 42-43. Among other things, the Correctional Officer Defendants argued that they were entitled to qualified immunity on Appellee's 42 U.S.C. § 1983 denial of medical care claim. Prime Care separately filed a Motion to Dismiss on February 12, 2024. J.A. 121-122. Appellee responded to both Motions. J.A. 8-9.

4

The District Court addressed both motions in a Memorandum Opinion and Order docketed on September 27, 2024. J.A. 123-142. As relevant to this appeal, the Court found that Appellee had adequately pleaded a 42 U.S.C. § 1983 claim for deliberate indifference to Ms. Rice's serious medical needs against <u>all</u> of the Correctional Office Defendants. J.A. at 129-130. The Court also found that the Correctional Officer Defendants were not entitled to qualified immunity, "as Ms. Rice had a clearly established right to medical treatment for her serious medical condition." J.A. 130, at n.3. The Correctional Officer Defendants timely noted an appeal of the District Court's denial of qualified immunity on October 8, 2024. J.A. 145.

## STATEMENT OF FACTS

The Cecil County Detention Center is located in Elkton, Maryland. [2] J.A. 14, at ¶1. At the time of the underlying events in this matter, PrimeCare Medical, Inc. had entered into a contract to "provide medical services to detainees housed in CCDC." J.A. 18, at ¶28. Under this contract, PrimeCare and its employees were

---

[2] The facts, as presented in this section, are derived from Appellee's Complaint. J.A. 24-26, at ¶¶58-78. *See Jackson v. Lightsey*, 775 F.3d 170, 173 (4th Cir. 2014) ("Because [the plaintiff] appeals from an order granting a motion to dismiss under Rule 12(b)(6), we recount the facts as alleged by [the plaintiff], accepting them as true for purposes of this appeal."). However, as described in more detail below, Appellants contend that the District Court abused its discretion in failing to consider the exhibits attached to their Motion, which further demonstrate their entitlement to qualified immunity.

"responsible for the care, health, safety and proper medical treatment of all detainees in CCDC's facilities, including Ms. Rice." J.A. 18, at ¶29. As such, any qualified healthcare professionals assigned to the Cecil County Detention center were "Prime Care Medical, Inc., employees." J.A. 15, at ¶¶12, 14.

Cynthia Rice was booked into the Cecil County Detention Center at 11:09 p.m. on August 28, 2020. J.A. 24, at ¶60. During the booking process, she informed the booking deputy that she suffered from rheumatoid arthritis and that she recently used opioids and would likely experience withdrawal.[3] J.A. 24, at ¶¶59, 61. Approximately three and a half (3.5) hours after she arrived at the facility, Ms. Rice was seen by a qualified health care provider—employed by PrimeCare—for a medical intake screening J.A. 25, at ¶65. The "medical staff"[4] made the following observations about Ms. Rice's appearance and affect:

a. That Ms. Rice had suffered from heroin withdrawal during previous incarcerations.

b. That Ms. Rice had a previous history of heroin abuse.

c. That Ms. Rice showed signs of depression (crying, emotionally flat).

d. That Ms. Rice was overly anxious, panicked, afraid, or angry.

---

[3] Appellee has failed to identify which Deputy booked Ms. Rice into the Cecil County Detention Center. J.A. 24, at ¶59-61. Indeed, Appellee has not identified by name any Correctional Officer Defendant who interacted with Ms. Rice.

[4] Appellee does not identify any medical staff members by name in her Complaint. J.A. 24-26, at ¶¶ 58-78.

6

e. That Ms. Rice appeared to be under the influence of a drug.

f. That the medical and custodial staff were aware that Ms. Rice had been previously in custody.

g. Ms. Rice appeared disheveled.
h. Ms. Rice was listed as a heroin addict.

i. Ms. Rice indicated that she used four bags a day, seven days a week and had not used since the previous day.

j. The condition of Ms. Rice's gums and teeth was listed as "poor."

k. That Ms. Rice consented to being treated.

l. Ms. Rice indicated that she was feeling body aches but did not have a fever.

m. Ms. Rice had been previously prescribed opioid detox at the same facility.

J.A. 25, at ¶65. Ms. Rice's blood pressure reading was also "noticeably high at 141/95." J.A. 25, at ¶67.

After her medical screening, a "high priority" detox check was scheduled and Ms. Rice was taken back to a booking cell. J.A. 25, at ¶69. Throughout the "night, medical and custody staff did not act to assist Ms. Rice and told her to 'shut up' while she winced in pain."[5] J.A. 15, at ¶9, J.A. 26, at ¶75.

---

[5] Appellee has, however, not identified which Sheriff's Deputy had this interaction with Ms. Rice. J.A. 16, at ¶16.

At 8:59 a.m. August 29, 2020, "an incomplete set of vitals was taken by a Prime Care Medical, Inc., employee." J.A. 15, at ¶14. Less than an hour later, medical staff prescribed Ms. Rice an opioid detox regimen and clonidine. J.A. 25, at ¶70. Ms. Rice was again examined by a PrimeCare employee at 9:52 a.m. J.A. 26, at ¶72. During this examination, Ms. Rice reported "being in pain that she measured at 10 out of 10." J.A. 26, at ¶72. The Prime Care employee allegedly took "incomplete" vital readings and prescribed Ms. Rice "blood pressure medication." J.A. 26, at ¶72. Appellee asserts that the care rendered by the PrimeCare employees was substandard because, "[d]espite knowing of Ms. Rice's impending withdrawal," PrimeCare employees "failed to prescribe and/or carry out a proactive withdrawal treatment regime and also failed to implement a standard opiate withdrawal scoring protocol known as 'COWS.'" J.A. 15, at ¶12.

At approximately 12:30 on August 29, 2020, Ms. Rice informed a Sheriff's Deputy that she was not "ok." J.A. 16, at ¶16. When medical staff entered her cell, Ms. Rice was unresponsive. J.A. 16, at ¶16. She was "pronounced dead shortly thereafter by EMS personnel who responded to the scene." J.A. 16, at ¶16. Ms. Rice was incarcerated for approximately thirteen (13) hours prior to her death. J.A. 24, at ¶60; J.A. 26, at ¶77.

## SUMMARY OF THE ARGUMENT

The District Court erred in denying the Correctional Officer Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment based upon qualified immunity. J.A. 130, n.3. The Court's error is two-fold. It first erred in defining the constitutionally protected right as Ms. Rice's "right to medical treatment for her serious medical condition." J.A. 130, n.3. The Correctional Officer Defendants were not responsible for administering medical care to Ms. Rice and Appellee has pleaded that Ms. Rice was examined several times during the course of her thirteen (13) hours of incarceration by PrimeCare's qualified medical professionals. J.A. 25, at ¶65; J.A. 15, at ¶14; J.A. 26, at ¶72. Based on these examinations, PrimeCare's qualified health care professionals established a course of treatment for Ms. Rice, which Appellee claims was insufficient. J.A. 15, at ¶¶12, 14; J.A. 25, at ¶¶65, 67, 69, 70, J.A. 26, at ¶¶71-74. In light of these pleaded facts, the right at issue is properly defined as the right to have correctional officers override the medical judgment of qualified health care professionals. Such a right is not clearly established. The Court also erred in finding that Appellee plausibly pleaded that any—let alone all—of the Correctional Officer Defendants violated Ms. Rice's Fourteenth Amendment rights.

Alternatively, the District Court abused its discretion in summarily finding that it would be "inappropriate" to convert the Correctional Officer Defendants'

Motion to a Motion for Summary Judgment "because the parties have had no opportunity for discovery." J.A. 128, n.2. By failing to convert the Motion to a Motion for Summary Judgment, the Court declined to consider the attached exhibits, which further established the Correctional Officer Defendants' entitlement to qualified immunity.

For these reasons, Appellants respectfully request that this Court reverse the District Court's denial of qualified immunity.

## ARGUMENT

### I.   STANDARD OF REVIEW.

This Court reviews a District Court's "refusal to dismiss for qualified immunity *de novo*." *Thorpe v. Clark*, 37 F.4th 926, 933 (4th Cir. 2022). When ruling on a motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). However, "plaintiffs may proceed into the litigation process only when their complaints are justified by both law and fact." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "Thus, to survive a motion to dismiss, the complaint must 'state[] a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Jackson v. Holley*, 666 Fed.App'x 242, 243-44 (4th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

**II.    THE DISTRICT COURT ERRED IN DENYING THE CORRECTIONAL OFFICER DEFENDANTS' MOTION ON THE BASIS OF QUALIFIED IMMUNITY.**

The Correctional Officer Defendants' argument proceeds in four (4) sections. Section A outlines the well-established contours of qualified immunity. In Section B, the Correctional Officer Defendants assert that the District Court erred in defining the constitutional right at issue and that the relevant constitutional right was not clearly established. Alternatively, in Section C, the Correctional Officer Defendants argue that the District Court erred in finding that Appellee plausibly pleaded a claim of deliberate indifference to Ms. Rice's serious medical needs. Finally, in Section D, the Correctional Officer Defendants posit that the District Court abused its discretion in declining to consider the exhibits (which were uncontested) attached to their Motion, as these exhibits further demonstrated their entitlement to qualified immunity.

### A. The Qualified Immunity Analysis.

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield

11

officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 223. It gives "government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (internal quotes and citations omitted). "While qualified immunity provides a defense to liability, it is also intended to free officials from litigation concerns and disruptive discovery." *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024) (citation omitted). As such, the Supreme Court of the United States has "stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). *See also McVey v. Stacy*, 157 F.3d 271, 275 (4th Cir. 1998) ("It is therefore incumbent on the courts to review the immunity defense critically at an early stage of the proceedings to determine the legal questions of whether the plaintiff has asserted a violation of a constitutional right and, if so, whether the constitutional right allegedly violated was clearly established at the time the defendant acted.").

This Court's qualified immunity inquiry proceeds in two steps, which it may address in whichever sequence "will best facilitate the fair and efficient disposition of [the] case." *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021) (citation omitted). First, "a plaintiff must show a violation of a constitutional right." *Pfaller v. Amonette*, 55 F.4th 436, 444 (4th Cir. 2022) (citing *Thompson v. Virginia*, 878

12

F.3d 89, 97 (4th Cir. 2017)). Second, "the right at issue must have been 'clearly established' at the time of the defendant's misconduct." *Id.*

### B. The District Court Erred in Defining the Relevant Constitutional Right as Ms. Rice's Right to Medical Treatment for her Serious Medical Condition.

i.    *Defining the Right in Question.*

Appellants begin with the second prong of the qualified immunity analysis. To determine whether a constitutional right is "clearly established," a court "must first define the right at issue." *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016). This is because, the "way in which an alleged right is described matters." *Atkinson*, 100 F.4th at 505. The Supreme Court of the United States has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances he or she faced.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Courts must, instead, "identify the specific right the plaintiff alleges was infringed at a 'high level of particularity.'"[6] *Atkinson*, 100 F.4th at 505 (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250-51 (4th Cir. 1999)).

---

[6] This Court recently explained that, "while it's true that we require less specificity when defining the right in the Eighth Amendment context then when the Fourth Amendment is implicated, the unlawfulness must still be 'apparent' based on pre-existing law." *King v. Riley*, 76 F.4th 259, 266 (4th Cir. 2023) (cleaned up).

"A right is clearly established if existing precedent—either controlling case law or a consensus of persuasive authority from other Circuits—has placed the question beyond debate."[7] *King v. Riley*, 76 F.4th 259, 265 (4th Cir. 2023) (cleaned up). While this standard does not require "a case directly on point," the case law must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

    ii.    *The District Court's Error.*

In the instant case, the District Court, in a footnote and without independent reasoning, defined the constitutional right at issue as Ms. Rice's "right to medical treatment for her serious medical condition." J.A. 130, at n.3. This definition is misplaced, as Appellee has not plausibly pleaded that any Correctional Officer Defendant denied, delayed, or impinged Ms. Rice's access to medical care during her term of incarceration. J.A. 14-16, 24-26. To the contrary, she states in her Complaint that Ms. Rice was examined several times by PrimeCare's medical

---

[7] Appellants note that, in light the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015), this Court revised its test for deliberate indifference under the Fourteenth Amendment. *Short v. Hartman*, 87 F.4th 593, 608-09 (4th Cir. 2023). However, in determining whether a right was clearly established, the Court can consider pre-*Short* case law as "a change in the law . . . that occurs after the official's conduct is 'of no use in the clearly established inquiry.'" *Trozzi v. Lake Cnty.*, 29 F.4th 745, 761 (6th Cir. 2022) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam)).

professionals during her thirteen (13) hours at the Cecil County Detention Center. J.A. 14-16, 24-26. These caveats make the cases cited by the District Court inapplicable to the facts of the instant case.

The District Court first cites *Tarashuk v. Givens*, 53 F.4th 154 (4th Cir. 2022) in support of its denial of qualified immunity. J.A. 130, at n.3. The facts of *Tarashuk* are, however, inapposite to the facts of the instant case as it dealt with the failure of medical professionals to render adequate medical care.[8] There, an Emergency Medical Technician and a Paramedic were dispatched to the scene of a mental health crisis. *Id.* at 158. Once on scene, the medical providers administered an ammonia inhalant and checked the detainee's vital signs. *Id.* at 159-60. The detainee had no physical reaction to the inhalant and was unable to provide his name or otherwise respond to rudimentary questions. *Id.* at 160. After expressing their personal displeasure with the detainee, the medical providers did not provide any additional care or require that the detainee be sent to the jail or hospital for medical treatment. *Id.*

This Court defined the constitutional right at issue as "a pretrial detainee's right to adequate medical care and freedom from deliberate indifference to his serious medical needs." *Id.* at 164. It reasoned that a reasonable official in the

---

[8] For this same reason, this Court's opinions in *Pfaller v. Amonette*, 55 F.4th 436 (4th Cir. 2022) and *Stevens v. Holler*, 68 F.4th 921 (4th Cir. 2023) are inapplicable to the facts of the instant case.

medical provider's position would have known that "failing to properly assess and transport an unresponsive detainee with an altered mental state either to a hospital or to jail where the detainee could obtain adequate medical attention . . . could give rise to a Fourteenth Amendment violation." *Id.* at 165.

The District Court also cited *Scinto v. Stansberry*, 841 F.3d 219 (4th Cir. 2016) to support its denial of qualified immunity. J.A. 130, at n. 3. The facts of *Scinto* are also inapplicable to the facts of the instant case, as it dealt with a total failure to request or provide medical assistance to an inmate in obvious distress. There, while the facility's water was shut off, the plaintiff experienced a medical emergency during which he was throwing up vomit and blood and became incontinent. *Id.* He used the emergency phone to call for help. *Id.* When prison officials responded to the cell, they "offered no assistance" even though the plaintiff "had several 'outward signs' of his need for medical attention, including that his cell 'reeked to high heaven'" and that his face was covered with blood and vomit. *Id.* Instead of providing aid to the plaintiff, the prison doctor "looked at [him] in disgust and turned his head and started to walk away." *Id.* Similarly, the prison administrator "failed to provide [the plaintiff] with treatment or call for medical assistance, instead ordering prison guards to 'lock him up' in the Special Housing Unit." *Id.* Critically, the plaintiff did "did not receive medical attention until <u>at least two days after the . . . incident</u>." *Id.* (emphasis added).

16

Defining the right in question "as the right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs," this Court declined to award qualified immunity. *Id.* at 235. It reasoned that a "reasonable juror could reasonably infer that failing to treat, for two to five days, an inmate who is vomiting blood and experiencing evident physical distress creates a substantial risk that serious bodily injury will result or has already occurred." *Id.* at 232.

Returning to the instant case, before delving into the pleaded facts (or lack thereof), it is essential to highlight the truncated timeline presented in Appellee's Complaint. J.A. 24-26. Appellee has pleaded that Ms. Rice was booked into the Cecil County Detention Center at 11:09 p.m. on August 28, 2020. J.A. 24, at ¶60. Ms. Rice was found unresponsive in her cell at approximately 12:30 p.m. on August 29, 2020. J.A. 26, at ¶77. Ms. Rice was, therefore, incarcerated for approximately thirteen (13) hours and twenty-one (21) minutes before she died. J.A. 24, at ¶60; J.A. 26, at ¶77. Accordingly, this is not a case in which an inmate was incarcerated for months, weeks, or even one day, with a serious medical condition.

Unlike in *Tarashuk* and *Scinto*, Appellee pleads that Ms. Rice was seen by PrimeCare medical professionals several times in the hours after she was booked into the facility. J.A. 14-15, 24-26. Specifically, she states in her Complaint that a PrimeCare qualified health professional conducted Ms. Rice's medical intake

screening at 2:40 a.m. on August 29, 2020—less than four (4) hours after she arrived. J.A. 25, at ¶65. She also pleads that Ms. Rice was examined by PrimeCare employees again at 8:59 a.m. and 9:52 a.m. J.A. 15, at ¶14; J.A. 26, at ¶72. Based on these examinations, the PrimeCare medical professionals prescribed a course of treatment—which included an order for opioid detox, clonidine, and blood pressure medication—to combat the medical issues that Ms. Rice was confronting. J.A. 25, at ¶70; J.A. 26 at ¶72.

Appellee alleges that the course of treatment prescribed by the PrimeCare medical employees was inadequate as they "failed to prescribe and/or carry out a proactive withdrawal treatment regime and also failed to implement a standard opiate withdrawal scoring protocol known as 'COWS.'" J.A. 15, at ¶12. She also pleads that Ms. Rice should have "been transported to a local hospital." J.A. 16, at ¶16; J.A. 27, at ¶82.

Accepting these allegations as true, Appellee has pleaded that she received medical care close in time to her alleged injury, but that such medical care was inadequate. Accordingly, a generous reading of Appellee's Complaint implicates Ms. Rice's right to have correctional officers override the medical judgment of the PrimeCare qualified health care professionals. Such a right is not clearly established.

18

iii.   *Correctional Officers Are Not Constitutionally Obligated to Override the Judgement of Medical Professionals.*

This Court, and Courts of Appeal throughout the Country, have explicitly recognized that the role of correctional officers and the role of medical professionals assigned to detention centers are drastically different. Simply put, correctional officers are not responsible for administering medical care to inmates. *McGee v. Parsano*, 55 F.4th 563, 573 (7th Cir. 2022) ("'The officers were not responsible for administering medical care' to the inmate."). Correctional officers are, instead, "entitled to defer to the judgment of jail health professionals." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("The standard for deliberate indifference is different for the medical staff."). The United States Court of Appeals for the Third Circuit has described the dichotomy between security staff and medical staff as follows:

> If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive *not* to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.

*Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not

19

treating a prisoner), a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.").

The instant case is factually and legally similar to *King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012). There, an inmate suffered from serious medical problems, including severe anxiety. *Id.* at 1015. After being booked into a detention center, jail medical staff ordered that the inmate be weaned off his prescribed anxiety medication. *Id.* In the days following his admission to the facility, the inmate started to severely shake and "became less and less coherent." *Id.* at 1016. He ultimately died in custody. *Id.* at 1017. Withdrawal from his anxiety medication "probably caused" the inmate's seizures and was a "contributing factor" to his death. *Id.*

On appeal, the United States Court of Appeals for the Seventh Circuit affirmed the District Court's grant of summary judgment in favor of the correctional officer defendants. *Id.* at 1018. It reasoned that "the officers were not responsible for administering medical care to [the inmate]; rather, they were 'entitled to defer to the judgment of jail health professionals so long as [they] did not ignore [the prisoner.]'" *Id.* at 1018 (quoting *Berry v. Peterman*, 604 f.3d 435, 440 (7th Cir. 2010)). The correctional officer defendants were not, the Court explained, "trained to assess whether an inmate is genuinely experiencing seizures, and so they lacked the capacity to judge whether [the nurse] made an inappropriate diagnosis." *Id.*

20

Similarly, in *McGee v. Parsano*, 55 F.4th 563 (7th Cir. 2022), a diabetic inmate was booked into a detention center and placed under the care of medical professionals. *Id.* at 566-67. This care proved to be inadequate and within six (6) days of admission to the facility, the inmate died. *Id.* The inmate's estate filed suit and the district court denied the correctional officers qualified immunity. *Id.* at 569.

The Seventh Circuit reversed. *Id.* at 575. It explained that correctional officers are entitled to qualified immunity unless "every reasonable officer [would] have understood that deferring to the judgment of medical staff in [the] circumstances was unlawful." *Id.* at 572. The established case law, the Court reasoned:

> dictates that correctional officers are not constitutionally obligated to override the judgment of medical professionals unless they have reason to know that an inmate is receiving inadequate treatment. This remains true when an inmate is in obvious distress and even when the medical staff has misdiagnosed an inmate—or worse, accused him of faking a very real illness.

*Id.* at 573. The Court explained that the obviousness of the inmate's deteriorating health was of "minimal relevance," as the "appropriate inquiry for a medical-care claim is whether the officers 'had a reason to believe (or actual knowledge)' that the medical staff was 'mistreating (or not treating)' an inmate." *Id.* at 574 (cleaned up) (quoting *King*, 680 F.3d at 1018). In the same vein, the Court clarified that "recognizing that someone is sick is not the same as knowing that he is receiving inadequate care from a trained medical professional." *Id.* at 575.

21

This Court, in *Milter v. Beorn*, 896 F.2d 848 (4th Cir. 1990), also recognized that correctional officers lack training to override the judgment of medical professionals. There, an inmate complained of chest pains, blackouts, and shortness of breath. *Id.* at 850. She was seen by prison medical professionals, who prescribed a course of treatment. *Id.* at 850-51. She ultimately died from an acute heart attack due to coronary artery thrombosis and arteriosclerosis. *Id.* at 851. This Court ultimately found that liability did not flow to the wardens of the facility or the correctional officers. *Id.* It offered the following reasoning:

> Even assuming that the physicians' failure to provide a cardiac exam was a "pervasive and unreasonable risk of harm from some specified source," . . . it would be an unprecedented extension of the theory of supervisory liability to charge these wardens, not only with ensuring that [the inmate] received prompt and unfettered medial care, but also with ensuring that their subordinates employed proper medical procedures—procedures learned during several years of medical school, internships, and residencies. No record evidence suggests why the wardens should not have been entitled to rely upon their health care providers' expertise.

*Id.* at 854 (internal citations omitted). The Court also explained that the correctional officers' participation in the inmate's "medical condition is even more remote than that of [the wardens'] and is too attenuated to suggest deliberate indifference on their part." *Id.*

In *Iko v. Shreve* 535 F.3d 225 (4th Cir. 2008), this Court reaffirmed the proposition that "a distant prison official can generally rely on his medical staff's

examinations and diagnoses." *Id.* at 242 (citing *Milter*, 896 F.2d at 854-55). It held, however, that the facts of the case did not "present a situation in which prison officials might be held liable for the actions or inactions of a medical professional." *Id.* at 242. Instead, the correctional officers faced liability "for *their own* decisions." *Id.*

The facts of *Iko* are materially distinguishable from the facts in the instant case. There, correctional officers deployed a large amount of pepper spray to effectuate a cell extraction of a non-compliant inmate. *Id.* at 232. The inmate subsequently collapsed. *Id.* The inmate did not receive medical treatment from a medical professional, nor did he receive decontamination care from the correctional officers. *Id.* He subsequently died from "Asphyxia," caused by "chemical irritation of the airways by pepper spray, facial mask placement, compressional and positional mechanisms." *Id.* at 233. The District Court denied the correctional officers qualified immunity on the plaintiffs' claim "that the officers showed deliberate indifference to [the inmate's] medical needs after he was doused in pepper spray." *Id.*

On appeal, this Court noted that the case differed from *Milter* and *Spruill* because it was "undisputed that [the inmate] received *no* medical treatment whatsoever." *Id.* at 242. "There was, therefore, *no* medical opinion to which the officers could have deferred." *Id.* Ultimately, the Court determined that "shuttling" the inmate "into a wheelchair upon his collapse without seeking any medical

23

evaluation or even decontamination" was an "insufficient response to [the inmate's] serious medical needs." *Id.* Accordingly, the Court affirmed the District Court's denial of qualified immunity. *Id.* at 243.

Taken together, this caselaw demonstrates that the Correctional Officer Defendants were not constitutionally obligated to override the judgment of the PrimeCare medical professionals. As such, Appellee has not pleaded that the Correctional Officer Defendants violated a clearly established right and these Defendants respectfully request that this Honorable Court reverse the decision of the District Court.

### C. The District Court Erred in Finding that Appellee Plausibly Pleaded that the Correctional Officer Defendants Violated Ms. Rice's Fourteenth Amendment Right to Medical Treatment.

Alternatively, even if this Court were to define the relevant constitutional right as the right to medical treatment for a serious medical condition, which it should not, the District Court erred in finding that Appellee has plausibly pleaded a claim for relief. J.A. 14-29. A review of the Complaint reveals that Appellee has not pleaded that any of the named Correctional Officer Defendants *had any interaction* with Ms. Rice. J.A. 14-16, ¶¶1-18; J.A. 24-26, at ¶¶58-94. Furthermore, the allegations generally asserted against the Correctional Officer Defendants as a collective group fail to plausibly suggest deliberate indifference to Ms. Rice's medical needs. J.A. 14-16, ¶¶1-18; J.A. 24-26, at ¶¶58-94.

24

The Due Process Clause of the Fourteenth Amendment "protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" *Short v. Hartman*, 87 F.4th 593, 608-09 (4th Cir. 2023) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). A pretrial detainee may "state a claim under the Fourteenth Amendment, based on a purely objective standard, for prison officials' deliberate indifference to excessive risks of harm." *Id.* at 604-05. To state such a claim, a plaintiff must plead that:

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Id.* at 611. It is "not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." *Id.* at 611-12.

In reviewing pleadings, this Court has "been critical of complaints that fail to isolate the allegedly unconstitutional acts of each defendant, or that make only categorical references to 'Defendants.'" *Langford v. Joyner*, 62 F.4th 122, 125 (4th Cir. 2023) (cleaned up). Requiring specific allegations "for each defendant gives fair notice to *that* defendant of the plaintiff's claims and the underlying factual support." *Id. See also Robbins v. Oklahoma*, 519 f.3d 1242, 1250 (10th Cir. 2008) ("Given the

25

complainant's use of . . . the collective term 'Defendants' . . . it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed."); *Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (collecting cases). Requiring that a plaintiff plead factual allegations as to each defendant is also consistent with liability under 42 U.S.C. § 1983, which rooted in each defendant's *personal* conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (Under Section 1983, "liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.").

This Court recently addressed this pleading deficiency in *Langford v. Joyner*, 62 F.4th 122 (4th Cir. 2023). There, in support of a deliberate indifference to a serious medical needs claim, the plaintiff "only made collective allegations against all 'defendants,' without identifying how each individual Defendant personally interacted with [the inmate] or was responsible for the denial of his Eighth Amendment rights." *Id.* at 125. Indeed, the plaintiff "did not identify who the Defendants are beyond being employees at [the prison], in what capacity each Defendant interacted with [the inmate], or how (or even if) each Defendant was responsible for [the inmate's] medical treatment." *Id.*

The Court concluded that the plaintiff had failed to meet his burden of "pleading a facially plausibly claim," as it could not "draw the reasonable inference

26

that *the* defendant is liable for the misconduct alleged." *Id.* at 125-26. Based on the facts alleged, the Court reasoned that it was "not reasonable to infer liability against each Defendant." *Id.* at 126. This was, in the Court's view, "especially the case with the nonmedical Defendants (the warden, case manager, and unit manager), where [the plaintiff's] 'global manner of pleading' makes his claim against those Defendants 'less plausible because some of the individual defendants had no reason to have known or interacted with [the inmate] at the time of the alleged violations.'" *Id.* at 126 (quoting *Barrett v. Bd. of Educ. of Johnston Cnty.*, 590 Fed.App'x 208, 211 (4th Cir. 2014) (per curiam)). The Court offered the following example:

> [S]horn of facts alleging otherwise, we cannot reasonably infer that the warden saw [the inmate] in the medical offices or personally denied him treatment. And the complaint is otherwise devoid of allegations that these particular Defendants were aware of [the inmate's] poor health or risks of failing to treat him. If anything, the opposite is true: the complaint acknowledges that [the inmate] was sent to an outside hospital . . . after complaining of abdominal pain and nausea, which produced "unremarkable" test results.

*Id.* at 126. The Court ultimately affirmed the District Court's grant of the defendants' motion to dismiss. *Id.* at 127. It noted in conclusion that, to survive a motion to dismiss, a complaint must state "sufficient facts to allow the court to infer liability as to *each* defendant." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). "This is baked into Rule 8's requirement that the complaint 'show' the plaintiff is entitled to relief." *Id.* (quoting Fed.R.Civ.P. 8(a)).

27

Here, Appellee's Complaint suffers from the exact same deficiencies discussed in *Langford*. The Complaint is rife with general allegations lodged against all sixteen (16) Correctional Officer Defendants, Cecil County Sheriff Scott Adams, and the seven (7) named PrimeCare qualified health care professionals.[9] J.A. 14-16, 24-26. Additionally, as in *Langford*, "no Defendant is specifically mentioned by name in the complaint." 62 F.4th at 126. For example, Plaintiff has pleaded:

- The medical and custody staff were aware of [Ms. Rice's] conditions both through their own personal observation and through the complaints of Cynthia Rice and her cellmates.

- Medical records indicate that the medical and custody staff were made aware that Ms. Rice would suffer withdrawal.

- Despite their knowledge of her condition and Ms. Rice's wailing in pain throughout the night, medical and custody staff did not act to assist Ms. Rice and told her to "shut up" as she winced in pain.

- Throughout her time at CCDC on August 29, 2020, Ms. Rice requested medical treatment and medication but was denied by the custody and medical staff.

- No deputy or medical staff took any action to aid the acutely and obviously ill Ms. Rice.

---

[9] The general nature of the allegations in the Complaint also suggest that Appellee failed to conduct a reasonable investigation of the factual and legal basis of her claims prior to filing suit. *See Brubaker v. City of Richmond*, 943 F.2d 1363 (4th Cir. 1991) ("The language of Rule 11 requires that an attorney conduct a reasonable investigation of the factual and legal basis for his claim before filing . . . The prefiling investigation must appear objectively reasonable.").

28

J.A. 14-16, at ¶¶7-9, 18; J.A. 26 at ¶76. Appellee has not even pleaded that each of the Correctional Officer Defendants was on the facility's premises during the brief term of Ms. Rice's incarceration. J.A. 21-23, at ¶¶41-57. She has, instead, stated in a conclusory fashion that each of these individuals was a "custody officer at CCDC during the period of August 28 and 29, 2024" and that each of these individuals "was responsible for the health, safety, and proper medical treatment of Ms. Rice." J.A. 21-23, at ¶¶41-57. These allegations are simply too general to put Sheriff Scott Adams, any of the sixteen (16) Correctional Officer Defendants, or any of the seven (7) PrimeCare medical employees, on notice of the claims and underlying factual allegations against them.

Even if this Court were to overlook the generality of the allegations pleaded in Appellee's Complaint—which it should not—Appellee has also failed to plead that any of the Correctional Officer Defendants intentionally, knowingly, or recklessly failed to act appropriately to address Ms. Rice's serious medical condition. *Short*, 87 F.4th at 611. As explained in more detail above, Appellee has pleaded that Ms. Rice was examined by PrimeCare medical staff several times during her thirteen (13) hours of incarceration. J.A. 14-15, 24-26. Based on these examinations, the PrimeCare medical professionals prescribed a course of treatment to combat the medical issues that Ms. Rice was confronting. J.A. 25, at ¶70; J.A. 26

29

at ¶72. The Complaint is entirely devoid of factual allegations that *any* of these officers knew that the treatment that Ms. Rice received was inadequate.

Appellee's Complaint also fails to plausibly suggest that any of the Correctional Officer Defendants knew or should have known that their inaction posed an unjustifiably high risk of harm to Ms. Rice. *Id.* Again, Ms. Rice was under the care of PrimeCare medical staff. J.A. 14-15, 24-26. She was seen—multiple times—by qualified medical professionals and Appellee has not pleaded any facts suggesting that *any* of the Correctional Officer Defendants had reason to question the treatment that Ms. Rice was receiving. Without facts alleging otherwise, the Correctional Officer Defendants were entitled to rely on the medical providers' medical judgment.

Accordingly, because Appellee has failed to plausibly plead that any of the Correctional Officer Defendants violated her Fourteenth Amendment rights, the District Court erred in denying their Motion to Dismiss. The Correctional Officer Defendants respectfully request that this Honorable Court reverse the judgment of the District Court and grant them qualified immunity.

### D. The District Court Abused Its Discretion in Declining to Convert the Correctional Officers' Motion to a Motion for Summary Judgment.

Should the Court find that the Correctional Officer Defendants are not entitled to qualified immunity based on the pleadings—which it should not do—the District Court abused its discretion by failing to convert their Motion to Dismiss to a Motion

30

for Summary Judgment. J.A. 148. In a footnote, the Court found that conversion to summary judgment was inappropriate "because the parties have had no opportunity for reasonable discovery." J.A. 128, at n.2. Appellee, however, failed to contest the exhibits attached to the Correctional Officer Defendants' Motion and failed to specify what discovery was needed to adequately respond.

A District Court's Rule 56(f) conversion decision "is reviewed under an abuse of discretion standard." *Nguyen v. CAN Corp.*, 44 F.3d 234, 242 (4th Cir. 1995). This Court has articulated two requirements for proper conversion of a Rule 12(b) motion to a Rule 56 motion: (1) notice and (2) a reasonable opportunity for discovery. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). The District Court's decision in this case turned entirely on the second requirement.

Ordinarily, conversion to summary judgment is not appropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). "At the same time, the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (internal citation omitted). A non-movant must typically file an affidavit or

31

declaration under Rule 56(d), explaining the "specified reasons" why it "cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). This Court has previously held that a "party may not simply assert in its brief that discovery was necessary." *Nguyen*, 44 F.3d at 242 (internal citation omitted).

Here, the Correctional Officer Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. J.A. 7, 42-43. Appellee did not file a Rule 56(d) affidavit in opposition to this Motion, nor did she otherwise specify what discovery was necessary for her to adequately respond to the Correctional Officer Defendants' Motion. J.A. 8-9, at ECF No. 38. Even without such an opposition, the District Court found that conversion to summary judgment was inappropriate, as "the parties have had no reasonable opportunity for discovery." J.A. 128, at n.2. As such, the Court declined "to consider the exhibits attached to the Motion." J.A. 128, at n.2.

Considering the purpose and intention of qualified immunity, the District Court's failure to convert the Motion constitutes an abuse of discretion. The uncontested exhibits attached to the Correctional Officer Defendants' Motion further illustrate that these defendants are entitled to qualified immunity, as they did not violate any of Ms. Rice's clearly established rights. J.A. 44-120, 147-166.

As it relates to the medical care that Ms. Rice received, the Correctional Officer Defendants attached her booking report, medical receiving screening, intake suicide screening, vital sign report, mental health screening, and medication log. J.A.

32

147-166. They also attached various incident reports, which demonstrate that correctional officers quickly responded to Ms. Rice's medical condition. J.A. 111-120.

Accordingly, considering together Appellee's lack of opposition and the purpose of qualified immunity, the District Court abused its discretion in failing to convert the Correctional Officer Defendants' Motion to a Motion for Summary Judgment. Should this Court find that these Defendants are not entitled to qualified immunity on the face of the Complaint, they respectfully request that this Court, considering the exhibits attached to their Motion, grant judgment in their favor.

## CONCLUSION

Based upon the foregoing, the Correctional Officer Defendants respectfully request that this Honorable Court reverse the District Court's denial of their Motion to Dismiss based upon qualified immunity. Alternatively, the Correctional Officer Defendants respectfully request that this Court grant summary judgment in their favor.

Respectfully Submitted,

KARPINSKI, CORNBROOKS & KARP, P.A.

BY:      /s/ Kevin Karpinski
        KEVIN KARPINSKI

        /s/ John Karpinski
        JOHN KARPINSKI

33

120 East Baltimore Street
Suite 1850
Baltimore, Maryland 21202-1617
410-727-5000
Kevin@bkcklaw.com
Jkarpinski@bkcklaw.com
*Counsel for the Appellants*

34

## **REQUEST FOR ORAL ARGUMENT**

Counsel for the Appellants respectfully requests oral argument in this matter.

KARPINSKI, CORNBROOKS & KARP, P.A.

BY:     /s/ Kevin Karpinski
    KEVIN KARPINSKI


    /s/ John C. Karpinski
    JOHN C. KARPINSKI
120 East Baltimore Street
Suite 1850
Baltimore, Maryland 21202-1617
410-727-5000
Kevin@bkcklaw.com
Jkarpinski@bkcklaw.com
*Counsel for the Appellants*

35

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __24-2026__        **Caption:** Rice v. Adams et al.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains ____8,093____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✔] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [*identify word processing program*] in
Times New Roman, 14 point font ____ [*identify font, size, and type style*];

**or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) John Karpinski _____

Party Name Appellant _____        Date: 12/24/2024 _____

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of December 2024, the foregoing was electronically filed and two copies of this Brief and one copy of the Joint Appendix were sent by first-class mail, postage prepaid, to:

Randy Evan McDonald, Esquire
1001 L Street, SE
Washington, DC 20003
**Counsel for Appellee**

/s/ John  Karpinski
*Counsel for the Appellants*